IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RANDAL K. WILLIAMS,                                       No. 3:15-cv-00589-HZ

          Plaintiff,

     v.

RELIANCE STANDARD LIFE                                    OPINION & ORDER
INSURANCE COMPANY,

          Defendant.

Megan E. Glor
John C. Shaw
MEGAN E. GLOR, ATTORNEYS AT LAW, P.C.
621 S.W. Morrison, Suite 900
Portland, Oregon 97205

      Attorneys for Plaintiff

Robert B. Miller
KILMER, VOORHEES & LAURICK, P.C.
732 N.W. 19th Avenue
Portland, Oregon 97209-1302

      Attorney for Defendant

1 - OPINION & ORDER

HERNANDEZ, District Judge:

Plaintiff Randal Williams brings this action against Defendant Reliance Standard Life Insurance Company under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (ERISA), challenging the termination of disability insurance benefits. Plaintiff's benefits were discontinued after two years when the policy required that he be disabled from "Any Occupation" instead of his "Regular Occupation." Both parties move for summary judgment. I grant Plaintiff's motion and I deny Defendant's motion.

BACKGROUND

Plaintiff obtained disability insurance as a benefit of his employment with NW Natural. AR 1-34[1] (Group Long Term Disability (LTD) Policy issued to NW Natural); AR 244 (notes regarding Plaintiff's eligibility). Plaintiff began working for NW Natural on September 21, 1979, and at the time he first filed his claim, he was an industrial gas servicer. AR 244.

I. The Policy

The LTD policy provides for a monthly disability income benefit after an initial 180-day elimination period. AR 7. To be eligible, the employee must be "Totally Disabled" as defined in the policy. AR 11. Under the policy,

"Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:

(1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the substantial and material duties of his/her Regular Occupation . . . ;

* * *

---

[1] Citations to "AR" are to the Administrative Record, ECF 12.

2 - OPINION & ORDER

(2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-Time basis.

Id.

"Sickness" is defined as an "illness or disease causing Total Disability which begins while insurance coverage is in effect  for the Insured."  Id.  "Any Occupation" is defined as "an occupation normally performed in the national economy for which an insured is reasonably suited based upon his/her education, training or experience."  AR 10.

II.  Plaintiff's Claim History

Plaintiff applied for disability coverage under the LTD policy in December 2011.  AR 328.  His application stated that he experienced certain symptoms on July 18, 2011 and first sought treatment for those symptoms on July 20, 2011.  Id.  The claim was received on December 29, 2011 by "Matrix," a third-party claims administrator used by Defendant.  AR 327, 328.  The claim was approved on January 19, 2012, for benefits beginning January 16, 2012.  AR 40, 244, 253-54.

On April 1, 2013, Defendant determined that Plaintiff was no longer eligible for LTD benefits.  AR 46, 279-8.  The claim notes indicate that Defendant found that Plaintiff's symptoms had improved and he was no longer "Totally Disabled" from his "Regular Occupation."  AR 247 ("close claim due to the medical no longer supports that the claimant is unable to perform the material duties of his own occupation").  However, in July 2013 Defendant reinstated Plaintiff's benefits retroactive to January 16, 2014 based on a June 2014 examination performed by Dr. Richard Rosenbaum, M.D.  AR 196; see also AR 48, 247-48, 741-54.

3 - OPINION & ORDER

In December 2013, Defendant notified Plaintiff that beginning January 16, 2014, Defendant was closing Plaintiff's claim. AR 292-94. The letter sent to Plaintiff, dated December 15, 2013, included information about the change in the definition of "Totally Disabled" occurring after twenty-four months of disability. Id. Defendant noted that during the first twenty-four months that LTD benefits are payable, the insured need be disabled only from the material duties of the insured's regular occupation. AR 292. In contrast, after twenty-four months, the insured must be disabled from "Any Occupation." Id. Because LTD benefits were paid to Plaintiff beginning January 16, 2012, the change in definition was effective January 16, 2014. Id. The particulars of Defendant's medical determination are discussed in more detail below. At this point, it is sufficient to note that Defendant determined that Plaintiff was capable of light work and could perform at least three positions given his education, experience, and skills. AR 293. As a result, he was no longer considered "Totally Disabled" because he could perform some jobs in the light exertion level. Id. The letter closed with information related to appeals and ERISA claims. AR 293-94.

Plaintiff appealed. AR 51-52, 295. On June 11, 2014, Defendant adhered to its previous decision that Plaintiff was not "Totally Disabled" from "Any Occupation" and thus, it upheld the termination of Plaintiff's LTD benefits. AR 300-11; 312-22. Although this denial letter contained more discussion of Plaintiff's medical records and history, Defendant still concluded that Plaintiff could perform "light" exertion occupations and thus, as of January 16, 2014, he was no longer "disabled" under the LTD policy. Id. This litigation followed.

III. Plaintiff's Medical History

In his initial application for LTD benefits, Plaintiff reported symptoms of loss of vision,

4 - OPINION & ORDER

sweating, motion sickness, nausea, vomiting, and throbbing headache which began while at work on July 18, 2011. AR 328. Over the next three years, he was seen by several doctors, including his primary care provider Dr. Shawn Marie Peters, N.D., and his treating neurologist Dr. Daniel Friedman, M.D. The Administrative Record contains hundreds of pages of medical records including records from his primary care practitioners as well as specialists he saw in an attempt to obtain a diagnosis and treatment for his symptoms. I recite the pertinent information here.

On July 20, 2011, Plaintiff saw Dr. Peters who prescribed an antibiotic and took a blood sample. AR 472. She also gave him a note taking him off of work for a few days but indicated he could return on July 25, 2011. Id. He tried a Scopolamine transdermal patch to help with the nausea but still suffered from blurriness in the right eye and vertigo. AR 469. Dr. Peters excused him from work until July 31, 2011 because of the vertigo, indicating that he might need a referral to an ear, nose, and throat (ENT) specialist. AR 466.

So began Plaintiff's examination by a variety of specialists. On testing by ENT Dr. Steven Gabel in early August 2011, Plaintiff's audiograms and tympanograms were normal. AR 350. Dr. Gabel diagnosed blurred vision, vertigo, and nausea. Id. He also recommended that Plaintiff have a brain MRI. Id. Plaintiff saw neurosurgeon Dr. Pankaj Gore in early September 2011. AR 408-12. Dr. Gore noted Plaintiff's continued report of persistent visual blurring and intermittent nausea. AR 409. Dr. Gore also noted that an August 4, 2011 brain MRI revealed the possibility of a subtle abnormality of a cavernoma but he did not believe this was responsible for Plaintiff's symptoms. AR 408, 411. He noted Plaintiff's past history of migraines. AR 411. He also noted that Plaintiff had had a normal optometry work-up. AR 409. Dr. Gore recommended a referral to a neurologist. AR 408. Given Plaintiff's continuing nausea and blurred vision, on

September 21, 2011, Dr. Peters authorized a modified work release with restrictions of certain activities through October 10, 2011. AR 419. On September 27, 2011, she changed the authorization to a temporary total disability work release through October 10, 2011. AR 418.

Plaintiff then began treating with neurologist Dr. Dan Friedman in early October 2011. He had been referred by both Dr. Gabel and Dr. Gore. AR 348, 408, 411. Dr. Friedman considered several diagnoses, planned a spinal tap and videonystagmography evaluation depending on the outcome of other tests, asked Plaintiff to keep a headache journal after noting his prior history of migraines, and referred him to an ophthalmologist. AR 414.

On October 17, 2011, Plaintiff was examined by ophthalmologist Dr. Paul Finley. AR 441-43. His examination revealed right and left eye "lateral gaze nystagmus." AR 442, 443. He diagnosed Plaintiff with "[a]cute and subacute iridocyclitis, unspecified" and "[s]ubjective visual disturbance, unspecified." Tr. 441. He explained that while the "magnitude of [Plaintiff's] symptoms" could not be explained "based on iritis alone, it could be contributing." Id. He also thought there might be an underlying autoimmune disorder. Id. Later, Dr. Friedman noted in early November that Dr. Finley had treated Plaintiff for iridocyclitis with no change in his symptoms and that Plaintiff continued to complain of blurred vision, worse with exertion. Tr. 439. After considering possible diagnoses, Dr. Friedman suggested a trial of a prophylactic headache medicine and prescribed Propranolol HC1. AR 439. He also authorized short-term total disability for several weeks. Id.

As a follow up to Dr. Gore's visit and notation of the possible cavernous hemangioma seen on the brain MRI, Plaintiff saw neurosurgeon Dr. Harry Reahl on November 11, 2011. AR 434-38. Dr. Reahl noted Plaintiff's report of right eye blurring, headaches which were better, and

6 - OPINION & ORDER

persistent nausea.  AR 434.  He opined that some of Plaintiff's symptoms could be explained by

sleep apnea or early diabetes.  AR 437.  He agreed with Dr. Gore that the brain "tiny left frontal

lesion" would not be causing Plaintiff's symptoms.  Id.  He ordered a sleep study and a metabolic

work-up.  Id.  The screening metabolic work-up was normal but the sleep study showed he had

obstructive sleep apnea.  AR 518, 520.  As to the latter, Dr. Reahl believed Plaintiff was a

candidate for a CPAP[2] and that if Plaintiff's headaches continued after a CPAP trial, a

prescription for Topamax could be considered.  Id.

On December 1, 2011, Plaintiff returned to see Dr. Friedman who noted that Plaintiff

reported worsening vision and increased blurred vision along with a "foggy feeling" in his head.

AR 481.  His headaches had improved since starting the propranolol.  Id.  Plaintiff indicated his

vision loss was constant.  Id.  Dr. Friedman assessed vision impairment in both eyes, headaches,

vertigo, dizziness, and giddiness.  Id.  He referred Plaintiff for a neuro-ophthalmology evaluation

and continued him off of work.  Id.

In December 2011, in support of Plaintiff's LTD benefits application, Dr. Peters

completed an attending physician form.  AR 446, 445.  She noted his primary diagnoses as vision

impairment in both eyes, dizziness, and headache based on symptoms of bilateral vision

impairment and blurring, vertigo, and headaches.  AR 446.  She noted his currently prescribed

medications as well as the specialist referrals to ENT, optometry, neurosurgery, neurology,

ophthalmology, and neuro-ophthalmology.  Id.  The description of Plaintiff's restrictions and

limitations assessed by Dr. Peters is a bit unclear in that when asked to assess how many hours

---

[2] CPAP stands for "continuous positive airway pressure" which is "a treatment that uses
mild air pressure to keep the airways open."
https://www.nhlbi.nih.gov/health/health-topics/topics/cpap

over the course of an eight-hour day (with two breaks and lunch), the patient could perform certain activities, she wrote "N/A" but she also checked "none" for standing, sitting, walking, and driving. AR 445. She also wrote "N/A" in response to the question of whether there were any "mental/nervous" limitations. Id. She indicated that Plaintiff had not achieved maximum medical improvement and it was unknown when he would. Id. She included three months of medical records along with the form. AR 446, 447. On that same date, Dr. Peters examined Plaintiff and noted that he had ongoing complaints of vision loss, headaches, and "lessened dizziness." AR 447. She noted his vision loss was constant, his dizziness had lessened, and his headaches had improved on the propranolol. Id. She remarked that he had seen multiple specialists and had been compliant with recommendations and treatment options. Id.

Plaintiff was examined by Dr. Julie Falardeau, a neuro-ophthalmologist, on January 11, 2012. AR 532-34. Dr. Falardeau noted Plaintiff's symptoms and recent history, including his blurred vision, headaches, head fogginess, dizziness, and nausea presenting in July 2011, as well as the specialists and he had seen and the testing received since that time. AR 532. Plaintiff noted a seven-month history of recurrent blurred vision, mainly in his right eye although he also has visual disturbances in his left eye. AR 532-33. He reported that the intensity of the blurred vision varied. AR 533. Along with the blurred vision, he had a "foggy head feeling," nausea, balance issues, and headache. Id. Dr. Falardeau noted that Plaintiff had been unable to work for several months mainly due to his visual symptoms. Id. Plaintiff described the episodes of blurred and "wavy" vision as "quite disabling." Id. Dr. Falardeau concluded with her impression:

From a visual standpoint, I strongly believe that Mr. Williams suffers from

persistent migrainous visual phenomena.  While prophylactic migraine medications are often helpful for the headache component of migraine, these medications can be very disappointing for the treatment of persistent migrainous visual aura.  I do not believe that his visual symptoms are related to transient ocular hypoperfusion.  While the treatment of persistent migrainous visual disturbances can be challenging, it might be worth it to consider another prophylactic migraine medication such as Topamax.  The course is typically good, and most patients do eventually have resolution of their visual symptoms.

AR 534.

Following the approval of his LTD disability claim in January 2012, Plaintiff continued to report vision problems.  E.g., AR 506, 513 (February 2012, Dr. Peters, Dr. Friedman); AR 563 (April 2012, Dr. Friedman); AR 551 (May 2012, Dr. Friedman); AR 716 (November 2012, Dr. Peters).  During this time, Plaintiff began using the CPAP which improved his sleep but did not help his vision issues.  AR 507, 557.

Dr. Friedman started Plaintiff on Topamax in February 2012.  AR 513.  By March 12, 2012, Plaintiff reported to Dr. Peters that previously, he could work on the computer for only five to fifteen minutes before blurriness occurred but that had improved to thirty to forty minutes before his vision blurred.  AR 557.  In April 2012, he told Dr. Friedman that he was experiencing vision difficulty after twenty to thirty minutes of activity and increased blurred vision with exertion.  AR 563.  Dr. Friedman increased the Topamax dose.  Id.  In May 2012, Dr. Friedman noted that Plaintiff believed the Topamax had not "offered any overall improvement."  AR 566.  At that time, Dr. Friedman indicated he was going to reduce the dose.  Id.  He also remarked that he could not explain Plaintiff's ongoing difficulty with vision.  Id.  He stated that "[o]cular migraine remains in the differential but the symptoms are unusual[.]"  Id.  He ordered a repeat MRI.  Id.

9 - OPINION & ORDER

Later that month, Dr. Friedman discontinued the Topamax altogether.  AR 568.  Plaintiff reported ongoing difficulty with his vision.  Id.  Plaintiff described that he had difficulty with concentration which led to increased blurred vision.  Id.  He also experienced the blurred vision with increased activity.  Id.  The repeat MRI was unchanged, showing a small cavernous angioma which was unlikely related to Plaintiff's symptoms.  Id.  Dr. Friedman again stated that "ocular migraine remains a consideration" even though the symptoms were atypical.  Id.  He recommended a trial of venlafaxine.  Id.  However, by July 2012, Plaintiff was continuing to complain of difficulty with vision which was worse with exertion.  AR 570.  Dr. Friedman discontinued the venlafaxine and prescribed no new prophylactic headache medication.  Id.

In mid-July 2012, Plaintiff was seen by optometrist Denise Godwin, O.D.  AR 601-03.  Plaintiff described his vision as 30% of normal, reported blurry vision, worse in the right eye compared to the left, and increased symptoms with exertion or if his head went below his heart.  AR 601.  Dr. Godwin noted the presence of an "empty sella" in Plaintiff's 2011 and 2012 MRIs and due to his other symptoms, she referred him for an evaluation of pituitary function.  AR 602.  She also started him on acetazolamide to see if it might help his symptoms.  Id.  In an August 6, 2012 addendum to her July 18, 2012 report, Dr. Godwin noted that Plaintiff was doing "very well on the acetazolamide" and reported that his vision problems were 95% better.  AR 603; see also AR 629 (Medical Report of Aug. 6, 2012 exam noting Plaintiff's report of 95% improvement in vision but still experiencing nausea/vomiting and dizziness).

In late August 2012, Plaintiff saw endocrinologist Dr. Maria Fleseriu for the pituitary evaluation recommended by Dr. Godwin.  AR 655.  She noted that Plaintiff had a "complex symptomatology dominated by blurry vision, fatigue, headaches (mostly throbbing) and nausea,

dizziness with loss of balance." Id.  The full pituitary panel ordered by Dr. Fleseriu was normal and she "could not find any pituitary cause for his symptoms." AR 650.

On September 12, 2012, Dr. Peters discussed Dr. Fleseriu's report with Plaintiff.  AR 687-89.  Plaintiff had not had any head throbbing or nausea for two to three months but continued to have dizziness and equilibrium issues that were worse with weather changes.  AR 687.  Dr. Peters ordered updated blood tests and a decrease in his testosterone dose.  AR 689. Later that month, Plaintiff reported to Dr. Friedman that he had "some improvement in vision" on the acetazolamide, but an increase in grogginess and headaches which were worse under stress. AR 624.  Dr. Friedman recommended tapering off the acetazolamide to determine if it was benefitting him.  Id.  He was to follow up in six months.  AR 625.

In November 2012, Plaintiff was still taking the acetazolamide and reported to Dr. Peters that it had "improved his vision complaint of blurriness about 20%." AR 716.  His headaches and blurred vision were worse with sinusitis, stress, and foggy/wet weather changes.  Id.  In January 2013, Plaintiff again reported to Dr. Peters that the acetazolaide had helped with his vision blurriness by about 20%-30%. AR 713.  Plaintiff also stated that previously, he could walk only one-quarter of mile before vision blurriness, headaches, and vertigo began but now, he could walk three-quarters of a mile.  Id.  And in February 2013, Dr. Peters noted that Plaintiff continued to have blurry vision issues and that while the acetazolamide helped, cold air and increased stress made his vision worse.  AR 709.  Without a hat in cold weather, his vision blurriness occurred within ten minutes.  Id.

On February 28, 2013, Dr. Peters completed a Physical Capabilities questionnaire for Defendant.  AR 702-03.  The form instructed Dr. Peters to assess Plaintiff's ability to perform

11 - OPINION & ORDER

various activities "on a regular basis in an 8-hour workday." AR 702. Dr. Peters indicated that

Plaintiff could continuously (defined as 67%-100%) perform many activities, and could

frequently perform (defined as 34%-66%) activities of walking, climbing ladders, or driving. AR

702-03. She also opined that he could work at a "heavy lift" exertion level, meaning he could

exert 50-100 pounds of force occasionally, and/or 25-50 pounds of force frequently, and/or 10-20

pounds of force constantly. AR 702. In response to a question if there were "[a]ny other factors

affecting the patient's physical abilities," Dr. Peters wrote "[h]eadaches, vertigo, vision changes."

AR 703.

    In April 2013, Dr. Peters clarified that as she understood the Physical Capacities

questionnaire, it "did not allow for repetition or time constraints." AR 736. She explained that

"[h]e is able to do some activity, but can only handle a few repetitions or minimal time while

doing the activity before his vision gets blurred." Id. She noted that although Plaintiff had seen

specialists, and had slight improvement with acetazolamide, he continued to have episodes of

vision impairment which were worse with activities such as bending forward, walking more than

ten minutes, or physical exertion. Id. At the end of her April 8, 2013 medical report she clarified

that

> [Plaintiff] is unable to return to work at his time due to the vision disturbances.
> He is able to perform the tasks listed on the updated Physical Capabilities
> Questionnaire submitted 3/1/2013, however, the % range is large and he is only
> able to perform these tasks with few repetitions. I would say that Mr. Williams is
> 67-75% (not up to 100%) able to perform the tasks listed on the form, but only
> once or twice before the vision impairments starts. The form does not allow for
> time constraints, so I believe there was some confusion on his [signs/symptoms]
> and the possibility of improvement. Again, Mr. Williams is unable to return to
> work at this time.

AR 738.

On April 10, 2013, Dr. Friedman noted that Plaintiff still had fluctuations in his vision. AR 739.  Plaintiff believed the acetazolamide was helping but he reported that activity still caused increased vision change.  Id.  He also reported experiencing headaches for two to three days every two to three weeks, which worsened with stress.  Id.  Dr. Friedman continued Plaintiff on the acetazolamide and noted that Plaintiff continued to experience difficulty with vision which was worse with activity.  AR 740.  He continued to believe that "ocular migraine remain[ed] a consideration[,]" albeit with unusual symptoms.  Id.  He stated that Plaintiff was unable to return to work at this time.  Id.  In May 2013, Dr. Peters reported that Plaintiff had chronic vision disturbances and was still seeing Dr. Friedman for his vision disturbances and headaches.  AR 767.  Plaintiff continued to report that the acetazolamide helped with his vision and he would continue taking it.  Id.  Dr. Peters remarked that "[a]ny activity promotes vision changes."  Id.

On June 25, 2013, Plaintiff was examined by Dr. Rosenbaum, a neurologist, for an IME requested by Defendant.  AR 741-54.  Dr. Rosenbaum reviewed Plaintiff's medical records and conducted a physical examination.  Id.  He noted Plaintiff's complaints of fogginess, visual trouble, headaches, and imbalance.  AR 745.  Plaintiff reported intermittent "druggy/foggy feelings, which progress to visual blurring and loss of focus and can then progress to loss of balance and trouble thinking."  Id.  Plaintiff reported headaches occurring seven or eight times per month.  AR 746.  The "druggy" onset occurred with activity but could be present on arising. Id.  He had occasional photophobia.  Id.  His current symptoms could be precipitated by walking half a block, while concentrating, being stressed, reading, or bending over.  Id.  Acetazolamide was helping a bit.  Id.  Dr. Rosenbaum recited the specialists, testing, and treatments Plaintiff had

13 - OPINION & ORDER

seen, underwent, or tried over the previous two years, including cessation of caffeine, physical

therapy, CPAP, and lumbar puncture.  Id.  He noted Plaintiff's history of migraines since his

thirties.  Id.  Dr. Rosenbaum also noted Plaintiff's history of minor head injuries.  AR 747.

Plaintiff boxed and played football in his youth, he was in a car accident in 1979, he hit his head

falling off a motorcycle at age 14, and hit his head falling off of a bicycle at age 12.  Id.  He had a

helmet on for the motorcycle fall, but not when he fell off the bicycle.  Id.

On physical examination, Plaintiff was in no acute distress and his general physical

examination was "remarkable only for his obesity."  AR 748.  His neurological examination,

including mental status, was normal.   AR 749.  Dr. Rosenbaum agreed that the 2011 and 2012

MRIs showed an empty sella and probable small left frontal cavernoma.  Id.

Dr. Rosenbaum's diagnoses were recurrent visual disturbance and migraine.  AR 750.  He

opined that Plaintiff's "visual disturbance suggests recurrent migrainous aura."  Id.  This is

consistent with the diagnosis issued by neuro-ophthalmologist Dr. Falardeau in January 2012.

AR 534.

Dr. Rosenbaum was asked to outline and discuss his objective clinical examination

findings and diagnostic results and whether the claimant's subjective complaints were consistent

with the objective clinical findings.  AR 750.  In response, Dr. Rosenbaum stated that Plaintiff

had subjective complaints that were unaccompanied by objective clinical findings.  Id.  He

explained that Plaintiff had no objective functional impairment and based on his examination,

medical records review, and Plaintiff's subjective complaints, he had filled out a Physical

Capacities Evaluation form showing Plaintiff's limitations.  AR 751.  He noted that according to

Plaintiff, his work capacities were further limited because of the things that could cause his

14 - OPINION & ORDER

symptoms to increase.  Id.  In the form, Dr. Rosenbaum indicated that Plaintiff could not bend at

the waist at all, could occasionally (defined as 33% or less) walk, squat, climb ladders, and drive;

could frequently (defined as 34%-66%) stand, climb stairs, kneel, crawl, use foot controls; and

could continuously (defined as 67%-100%) sit.  AR 753.  He concluded that Plaintiff could

occasionally work at the medium exertion level, defined as exerting up to 20-50 pounds of force,

and could exert up to 10-25 pounds of force frequently and/or up to 10 pounds amount of force

constantly.  Id.  He also found that Plaintiff could frequently perform all upper extremity

activities.  AR 754.

Again in response to specific questions, Dr. Rosenbaum said that under the Dictionary of

Occupational Titles classifications, Plaintiff was capable of light work, "but by his history, he

might have to take frequent work breaks or hours of time off due to the current subjective

symptoms."  AR 751.  He noted that activity restrictions were based on Plaintiff's report of

increasing symptoms with activities such as walking, bending, reading, or stress.  Id.

Dr. Rosenbaum suggested that a further trial of other migraine-preventing drugs might be

helpful and he would again advise stopping caffeine and minimizing any nonessential

medication.  Id.  He opined that Plaintiff's prognosis for recovery was guarded.  Id.  He noted that

Plaintiff had already tried other migraine prophylactic medications without success.  Id.  Still, he

thought that further medication trials were worthwhile.  Id.  In response to a question asking for a

"return-to-work date," if the employee was presently unable to work, Dr. Rosenbaum said that

Plaintiff's return-to-work date was unknown due to Plaintiff's subjective complaints.  Id.  He

recommended combining further trials of migraine prophylactic drugs with efforts at increasing

activity and reconditioning.  Id.

In September 2013, Plaintiff saw Dr. Peters who recorded his chief complaint as blurred vision. AR 771. Plaintiff continued to complain of "head in clouds feeling, decreased eye focus, equilibrium problems, then nausea." Id. He reported that it took anywhere from two hours to four days to recover. Id. In thirty-six days of tracking symptoms, the shortest recovery time was 1.5 hours, with the normal recovery range 2-4 hours. Id. He could read only about ten minutes before vision started to blur. Id. In November 2013, he saw Dr. Friedman who noted that Plaintiff continued to "experience difficulty with vision which is worse with any activity and is not able to return to work at this time." AR 784. Plaintiff and Dr. Friedman discussed discontinuing the acetazolamide as Plaintiff was uncertain he was continuing to receive any benefit from it. Id. Dr. Friedman noted that Plaintiff was unable to return to work. Id.

In November 2013, Plaintiff was approved for social security disability. AR 755, 787-93.

As noted above, Defendant discontinued Plaintiff's eligibility for LTD benefits beginning January 16, 2014. AR 292-94. In response, Plaintiff submitted a handwritten appeal letter dated January 17, 2014. AR 809. There, he explained that his disability was not based on the amount of weight he could lift but was "due to brain function caused from continuous migraine symptoms that effects [sic] vision, balance, and causes nausea, vomiting, headaches, throbbing headaches, memory loss, loss of motor function, and druggy foggy head." Id.

In response to Plaintiff's appeal, Defendant scheduled Plaintiff for a second neurology IME with Dr. Lynne Bell, M.D., who examined Plaintiff on April 16, 2014. AR 207-09; 821-51. She noted his chief complaint of "[b]lurry vision worse with activity, associated with foggy feeling in the head and sense of imbalance." AR 823. Plaintiff told Dr. Bell about the head trauma in his youth and his history of migraines. AR 823. Plaintiff described his symptoms to

Dr. Bell as vision blurriness with activities such as walking or reading, beginning in the right eye and gradually spreading to the left, but always remaining worse in the right eye.  AR 825.  He stated that when he continues the aggravating activity, the blurriness increases to the point of almost all of his vision become obscured.  Id.  He then feels a pressure sensation in his head.  Id.  His mind gets slow, he is slower to react, he becomes nauseated, and then starts to lose his balance.  AR 826.  His walking tolerance is variable and depends on the weather.  Id.

Dr. Bell's report includes a detailed chart review, beginning with a May 2011 evaluation by Dr. Michael Owen, M.D., pre-dating the onset of the current symptoms, and ending with a November 13, 2014 examination by Dr. Friedman.  AR 827-44.  She also conducted a neurological examination.  AR 845-46.  She noted the 2011 MRI and stated there were no abnormalities that would explain Plaintiff's symptoms.  AR 846.

As for a diagnosis, Dr. Bell stated:  "The diagnosis for the medical condition currently impacting Mr. Williams' status I believe remains unknown, but there is a possibility that his symptom complex is a form of somatoform disorder."  Id.  She further explained:

> In summary, Mr. Williams provides a long history of unusual neurological symptoms.  He has an even longer history of subjective complaints such as repeated bouts of flu-like symptoms in the past, as well as history of "migraine headaches" in the past, which he says were successfully treated with "detoxification" by his naturopathy.  The headaches he reported in the past were not associated with visual scotoma.
>
> His current clinical syndrome is quite unusual and I do not believe it fits easily into any specific neurological diagnosis.  A neuro-ophthalmologist has rendered a diagnosis of "persistent migrainous visual phenomenon."  However, his subjective complaints go well beyond the visual phenomenon to include profound fatigue, imbalance, cognitive dysfunction and a variety of other disabling symptoms.  His unusual constellation of symptoms, the gradual worsening over time, the resistance to treatment with headache prophylactic medications that typically work for migraine conditions all raise the question as to whether this is a true organic

neurological or neuro-ophthalmological disorder versus a somatoform
presentation.  A somatoform presentation would fit better with the overall clinical
picture, and I am somewhat surprised that it has not even been a consideration by
any of the specialists evaluating Mr. Williams.

AR 846.

In response to the specific request to document and discuss her primary and secondary

diagnoses and how they correlated with her clinical findings, Dr. Bell wrote:

My primary diagnosis would be rule out possible somatoform disorder
contributing to his unusual constellation of neurological complaints and stated
level of disability.  In my opinion, it is far less likely that he harbors a condition of
"persistent migrainous visual phenomenon."  Mr. Williams' overall clinical profile
is quite consistent with a somatoform disorder.  He has "stumped" numerous
specialists.  He has tested normally on virtually all diagnostic testing, except for
some spurious and incidental findings on neuroimaging studies.  His symptoms
wax and wane, worsen with stress, and fail to respond to any of the normal
treatments for the putative diagnoses which have been offered such as migraines
or migrainous equivalents.  He also has a more lengthy history of vague subjective
complaints variously diagnosed as sinusitis, recurrent illnesses, that have led to
disability on a relative frequent basis in the past.  In short, he has the hallmark
features of a somatoform disorder.

AR 847.

In response to the question asking for medical data to substantiate the presence of

Plaintiff's complaints, Dr. Bell said there was no objective medical data.  Id.  There were no

objective abnormalities that she found on clinical examination and none documented in the

records from numerous specialists.  AR 848.  When asked to comment on Plaintiff's current

treatment plan, Dr. Bell wrote that the current treatment plan was not reasonable "as there really

is no current treatment plan."  Id.  "He has been rendered a diagnostic label for which there is,

according to the diagnosing physician, no treatment."  Id.  However, she continued, "the

possibility of a psychogenic condition, i.e. a somatoform disorder has not even been considered.

Appropriate testing has therefore not been done.  Appropriate testing would include a psychiatric

IME examination with Minnesota Multiphasic Personality Inventory profile."  Id.

Dr. Bell opined that Plaintiff's prognosis was guarded as "he continues to be labeled with

a diagnostic condition for which there are no actual objective findings and no known medical

treatment."  Id.  She noted that "his only impairment has been based on subjective complaints of

inability to perform work or exercise for very long."  Id.  Question #10 posed by Defendant to Dr.

Bell asked her to "advise if the claimant has work capacity on a full time consistent basis as of

January 16, 2014 and going forward."  AR 848.  She was instructed to include the basis for her

opinion either by completing a Physical Capabilities form or providing a statement in her report

based on certain definitions.  Id.  Dr. Bell did not complete the form and did not provide an easily

identifiable response to the question in her report.  AR 848-49.

In a subsequent report dated May 7, 2014, Dr. Bell wrote that she was in receipt of a

request for additional clarification regarding Plaintiff.  AR 850.  In particular, she noted that she

had "been asked to respond to question number 10 based on objective findings only.  Please find

changes to question number 10 below."  Id.  In response, she wrote that there were "no

limitations based on neurological findings" and referred the reader to the Physical Capabilities

form.  AR 851.  There, in a form dated May 9, 2011, she indicated that Plaintiff could

continuously (defined as 67%-100%) perform all activities such as sitting, standing, walking,

bending, etc., and continuously perform all activities with his upper extremities.  AR 852-53.  In

response to the question at the end of the form of whether there were any other factors affecting

the patient's physical abilities, Dr. Bell wrote: "I have been instructed to fill this out based on

OBJECTIVE Findings only.  There are no limitations BASED ON OBJECTIVE

19 - OPINION & ORDER

NEUROLOGICAL Findings." AR 853.

IV.  Defendant's Initial Denial for LTD Benefits After January 16, 2014

In a December 16, 2013 letter, Defendant informed Plaintiff that he would be discontinued from LTD benefits beginning January 16, 2014.  AR 292-94.  After noting the change in definition for "Total Disability" to "Any Occupation" from "Regular Occupation," Defendant told Plaintiff that it had reviewed "all of the information in your claim file," including but not limited to, the information provided by Dr. Friedman and Dr. Peters.  AR 292-93.  Based on this information, Defendant determined that Plaintiff was capable of light work activity with restrictions and limitations of no bending at the waist.  AR 293.  Next, Defendant told Plaintiff that all of his claim file information was reviewed by Defendant's vocational staff which determined, based on the medical information as well as Plaintiff's training, education, and experience, that Plaintiff possessed transferrable skills that allowed him to perform the light exertion occupations of Gas-Meter Checker, Gas-Meter Mechanic I, and Gas-Meter Mechanic II. Id.  As a result, Defendant concluded that Plaintiff no longer satisfied the requirement for Total Disability beyond January 16, 2014.  Id.

Defendant also noted that while it

> consider[ed] the determinations of Social Security and other insurers, they are not binding on [Defendant's] decision as to whether or not you meet the definition of "Total Disability" as set forth in your Policy.  A person's entitlement to each of these benefits may be based upon a different set of guidelines, which sometimes lead to differing conclusions.  In addition, each benefit provider may also be considering different medical evidence in the evaluation of a claim.  In any event, the receipt of SSDI benefits does not guarantee the receipt of LTD benefits or vice versa.

Id.

20 - OPINION & ORDER

Next, Defendant told Plaintiff that he could request a review of the determination by submitting a request in writing.  Id.  He was told that his request should state any reasons why he believed the determination was incorrect, "and should include any written comments, documents, records, or other information relating to your claim for benefits, including but not limited to any information submitted in conjunction with any claim for Social Security disability or other benefits which you would like us to consider."  Id.

V.  Defendant's Affirmance of its Initial Denial

On June 11, 2014, Defendant affirmed its December 16, 2013 determination that as of January 16, 2014, Plaintiff was ineligible for LTD benefits.  AR 300-11.  Defendant told Plaintiff it had conducted an independent review of his claim file and concluded that its original termination was appropriate.  AR 300.  The letter stated that when considering all of the medical evidence in the claim file, the information did not "substantiate a physical condition that was at a level of severity" precluding Plaintiff from performing "the full-time material duties of a *light* occupation."  Id. (footnote defining "Light" omitted).

The June 11, 2014 denial included notes of some of Plaintiff's medical history.  AR 302-09.  At the end of that recitation, Defendant stated that based on the treatment notes, "initially the extent of your disability supported an inability to perform the material duties of your Regular Occupation."  AR 308.  Then, the letter further explained as follows:

> [T]he ongoing series of treatment notes reflect a slight improvement in your condition, with no diagnostic testing confirming the nature of an impairment.  In addition, per the Physical Capabilities Questionnaire completed by Dr. Peters as of February 8, 2013, addressing your ability to work on a full-time consistent basis, it indicated that you are capable of performing at a *heavy* exertion level with no limitation regarding the use of your upper and lower extremities.  In completing this questionnaire, Dr. Peters later clarified within an evaluation dated

April 9, 2013, that you are 65-75% able to perform the tasks referenced, once or twice before experiencing a vision impairment.  Thus, Dr. Peters indicated an inability to return to work at this time.  While you may be precluded from performing at a *medium* to *heavy* exertion level, Dr. Peters' assessment is not consisted with an inability to perform *light* work.

AR 308-09 (footnote defining "Heavy"omitted).

Next, Defendant noted the results of Dr. Rosenbaum's IME, which Defendant described as "indicating an ability to perform at a *medium* exertion level with limitations specific to occasional walking, squatting at knees, climbing ladders and driving." Id.  "Thus," the letter continued, "Dr. Rosenbaum's opinion further confirmed your ability to perform the material duties of a *light* occupation." Id.  Based on "these results," Defendant then decided to have Plaintiff undergo a subsequent IME with Dr. Bell.  Id.

Defendant then quoted Dr. Bell's opinion regarding her primary diagnosis of "rule out possible somatoform disorder[.]" Id.; see also 847 (Dr. Bell report).  Defendant relied on Dr. Bell's assessment of Plaintiff's ability to work full-time which, according to Defendant, indicated that Plaintiff could continuously sit, stand, walk, bend at the waist, squat at the knees, climb stairs and ladders, kneel, crawl, use foot controls, and drive, and that he could sustain a medium level of exertion.  Id.  Defendant explained that given Dr. Bell's assessment, the information in Plaintiff's claim file was further reviewed by a vocational specialist to determine "if the current restrictions and limitations defined as *light* would prevent you from performing the material duties of Any Occupation." AR 309-10.  This vocational specialist concluded that Plaintiff could perform the three gas-meter jobs previously identified by Defendant in the December 6, 2013 termination letter.  AR 310.

Defendant concluded the determination analysis by stating:

22 - OPINION & ORDER

In considering the totality of data concerning your medical condition in conjunction with the independent opinions by Dr. Rosenbaum and Dr. Bell, our Vocational Rehabilitation Specialist concluded that you would be able to perform the material duties of the above referenced occupations. Thus we have further concluded that you no longer satisfy the definition of "*Totally Disabled*" beyond January 16, 2014.

The purpose of this review was to determine if the medical data documents the presence of a physical or mental health condition that would limit your ability to perform Any Occupation. While we are not disputing that you may have ongoing symptoms related to your migraines, intermittent blurred vision, nausea with occasional vomiting, dizziness, and diaphoresis, our position is that the severity of these ailments do not preclude you from *light* work function. Our position is further confirmed through the independent opinions of Dr. Rosenbaum and Dr. Bell.

AR 310.

Two days later, Defendant issued an almost identical letter to Plaintiff. AR 312-14 (June 13, 2014 Letter). This second letter included, at the end, the same paragraph related to social security benefits as Defendant previously provided in the December 16, 2013 letter. AR 322. This time, however, Defendant added a bit of information specific to Plaintiff: "For example, in your situation, the Social Security Administration ('SSA') did not have the results of the IMEs conducted by Dr. Rosenbaum and Dr. Bell or other medical or vocational information [Defendant] may have developed in your file." Id. The letter continued: "Had the SSA reviewed this report along with the other medical information obtained by us, they may have reached a different conclusion." Id.

STANDARDS

Traditionally, summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). However,

23 - OPINION & ORDER

> [t]raditional summary judgment principles have limited application in ERISA cases governed by the abuse of discretion standard.  Where, as here, the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is, in most respects, merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.

Stephan v. Unum Life Ins. Co. of Am., 697 F.3d 917, 929–30 (9th Cir. 2012) (citations, internal quotation marks omitted).  Additionally, "judicial review of benefits determinations is limited to the administrative record—that is, the record upon which the plan administrator relied in making its benefits decision[.]"  Id. at 930 (internal quotation marks omitted).  "[W]hen a court must decide how much weight to give a conflict of interest under the abuse of discretion standard[,]  . . . the court may consider evidence outside the [administrative] record."  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 970 (9th Cir. 2006) (en banc).  In considering evidence outside the administrative record to decide "the nature and impact of a conflict of interest," id., traditional rules of summary judgment apply, and "summary judgment may only be granted if after viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact."  Stephan, 697 F.3d at 930 (internal quotation marks and brackets omitted).  "[T]he decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise."  Abatie, 458 F.3d at 970.

## DISCUSSION

### I.  Standard of Review

A denial of benefits by an ERISA plan administrator is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489

U.S. 101, 115 (1989). The grant of discretion must be unambiguous.  Abatie, 458 F.3d at 963.

Here, the LTD policy provides that Defendant

> shall serve as the claims review fiduciary with respect to the insurance policy and
> the Plan.  The claims review fiduciary has the discretionary authority to interpret
> the Plan and the insurance policy and to determine eligibility for benefits.
> Decisions by the claims review fiduciary shall be complete, final and binding on
> all parties.

AR 15.  This language expressly confers discretion on a plan administrator.

Plaintiff argues that a de novo standard applies because Oregon law prohibits

enforcement of Defendant's discretionary clause.  I do not resolve the issue because, as explained

more fully below, even under an abuse of discretion standard I conclude that Defendant's

termination of Plaintiff's LTD benefits was erroneous.

In reviewing for an abuse of discretion, an ERISA plan administrator's decision "will not

be disturbed if reasonable."  Conkright v. Frommert, 559 U.S. 506, 521 (2010) (internal

quotation marks omitted).  This reasonableness standard requires deference to the administrator's

benefits decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences

that may be drawn from the facts on the record."  Salomaa v. Honda Long Term Disability Plan,

642 F.3d 666, 676 (9th Cir. 2011) (internal quotation marks omitted); see also Tapley v. Locals

302 & 612 of Int'l Union of Operating Eng'rs-Emp'rs Constr. Indus. Ret. Plan 728 F.3d 1134,

1139 (9th Cir. 2013) (court "equate[s] the abuse of discretion standard with arbitrary and

capricious review").  Under this standard, Defendant's interpretation of the plan language "is

entitled to a high level of deference and will not be disturbed unless it is not grounded on *any*

reasonable basis."  Tapley, 728 F.3d at 1139 (internal quotation marks omitted).

Plaintiff argues that even if the abuse of discretion standard is appropriate, the Court

25 - OPINION & ORDER

should review Defendant's decision with additional "skepticism" because of Defendant's "structural conflict of interest."  Plaintiff argues that Defendant operates under a conflict of interest because Defendant is both the funding source for Plaintiff's disability benefits and the administrator deciding whether to approve continuation of his benefits.

When "the insurer acts as both funding source and administrator[,]" there is a structural conflict of interest that "must be weighed as a factor in determining whether there is an abuse of discretion."  Salomaa, 642 F.3d at 674 (internal quotation marks omitted).  However, structural conflicts do not divest the administrator of its delegated discretion.  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115–16 (2008).  Rather, "they weigh more or less heavily as factors in the abuse of discretion calculus."  Robertson v. Standard Ins. Co., _____ F. Supp. 3d ____, 2015 WL 5766923, at *7 (D. Or. Sept. 30, 2015); see also Abatie, 458 F.3d at 967 ("We read Firestone to require abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record.").

In a 2009 case, the Ninth Circuit provided guidance for applying the abuse of discretion standard when there is a structural conflict of interest.  Montour v. Hartford Life & Acc. Ins. Co, 588 F.3d 623, 629–30 (9th Cir. 2009).  A determination of whether a plan administrator abused its discretion turns on a consideration of "numerous case-specific factors, including the administrator's conflict of interest[.]"  Id. at 630.  In making that determination, the reviewing court must weigh and balance all of the factors together.  Id.  Factors that "frequently arise" in ERISA cases include:  (1) the quality and quantity of medical evidence; (2) whether the plan administrator subjected the claimant to an in-person medical evaluation or merely relied on a

paper review of the claimant's existing medical records; (3) whether the administrator provided

its independent experts with all of the relevant evidence; and (4) as applicable, whether the

administrator considered a contrary Social Security Administration ("SSA") disability

determination.  Id. at 630.  The weight assigned to the "conflict factor depends on the facts and

circumstances of each particular case."  Id.

Additionally, a "procedural irregularity" in violation of ERISA regulations, "is a matter to

be weighed in deciding whether an administrator's decision was an abuse of discretion."  Abatie,

458 F.3d at 972. "When an administrator can show that it has engaged in an ongoing, good faith

exchange of information between the administrator and the claimant, the court should give the

administrator's decision broad deference notwithstanding a minor irregularity."  Id. (internal

quotation marks omitted).  "A more serious procedural irregularity may weigh more heavily."  Id.

"When an administrator engages in wholesale and flagrant violations of the procedural

requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as

well," the court gives the administrator's decision no deference and reviews it de novo.  Id. at

971.

Here, Defendant does not dispute that it plays a dual role as claims administrator and

insurer.  Thus, the Court assesses "the reasonableness of the plan administrator skeptically[.]"

Salomaa, 642 F.3d at 666 (further stating that "[t]he conflict of interest requires additional

skepticism because the plan acts as a judge in its own case").

II.  Merits Discussion

Defendant's termination of Plaintiff's LTD benefits was unreasonable and an abuse of

discretion because (1) it implicitly credited Plaintiff's subjective symptoms but only did so

partially and thus, its initial determination of "sedentary" work and later determination of "light work" are not supported by the record;  (2) the decision was based on a lack of objective findings which the policy did not require to establish Total Disability: and (3) the consideration of Dr. Bell's report, diagnosis, and physical capacities assessment was unreasonable.

A. The Sedentary & Light Determinations

Based on the medical evidence, Defendant initially awarded LTD benefits because it determined that Plaintiff could not return to his medium exertion work and the applicable definition of "Total Disability" was met.  The record shows that when it made this determination, Defendant concluded that Plaintiff could perform only sedentary work.  AR 193 (Jan. 16, 2012 RN note stating that "[s]edentary restrictions and limitations are supported from the date of loss and ongoing"); see also id. (Apr. 2, 2012 note retaining sedentary restrictions); AR 194 (August and December 2012 notes finding sedentary restrictions continued to be supported).

In March 2013, Defendant concluded, based on Dr. Peters's February 2013 Physical Capabilities Evaluation, that Plaintiff's symptoms had resolved and he could perform heavy exertion jobs.  AR 195.  Based on Dr. Peters's April 2013 clarification of her previous assessment, Defendant again concluded that Plaintiff could function only at a sedentary level. AR 196 (Apr. 25, 2013 RN note stating "[c]linical information supports sedentary level of function to 1/16/2014 due to stated visual disturbance with any activity which have only slightly improved with treatment.").

In finding Plaintiff limited to sedentary work, Defendant appears to have credited Plaintiff's subjective symptoms because there have never been any objective medical findings to support Plaintiff's subjective limitations.  There is no basis for Defendant's finding other than it

accepted Plaintiff's self-reports of symptoms.

While this initial determination of sedentary work allowed Plaintiff to receive LTD benefits for the first twenty-four months of his disability, it was unsupported in the record. That is, the medical records, as explained, show that according to Plaintiff, various activities, even sedentary ones such as reading or concentrating, triggered Plaintiff's constellation of symptoms. He experienced intermittent, debilitating vision blurriness which precluded work activity. From the outset, his treating practitioners found him unable to work and their opinions remained consistent. Plaintiff's condition did not materially change. Defendant's sedentary determination produced the correct result in that Plaintiff was eligible to receive LTD benefits initially, but its decision cannot be supported by anything other than having credited Plaintiff's subjective symptoms. Once Defendant did so, it was arbitrary to only partially credit the full range of reported subjective limitations without explanation.

Subsequent to its initial determination, Dr. Peters indicated in the Physical Capacities Evaluation form in February 2013 that Plaintiff could perform work at a "heavy" exertion level and could continuously or frequently perform many gross motor activities. But, she explained in April 2013 that she had misunderstood the form and that while he could perform the tasks she had previously assessed 67% to 75% of the time, he could only perform those tasks "once or twice" before his vision impairment symptoms began. Thus, he was unable to return to work. The only reasonable interpretation of her assessment of Plaintiff's physical capabilities is that while Plaintiff could stand, walk, climb ladders, lift, etc., he could not sustain any such activity because after only "once or twice," his disabling symptoms interfered to the extent that he could not work.

29 - OPINION & ORDER

Similarly, when Dr. Rosenbaum examined Plaintiff in June 2013, he also assessed Plaintiff as having the ability to perform either medium or light work, but, because of Plaintiff's symptoms, Plaintiff would have to take frequent work breaks or hours of time off.  Thus, Plaintiff's return-to-work date was unknown.  The only reasonable interpretation of Dr. Rosenbaum's assessment is similar to Dr. Peters's: although Plaintiff could stand, walk, lift, etc., he could not sustain the activity because his disabling symptoms would require frequent breaks or hours of time off, precluding his ability to work.

While Plaintiff experienced a decrease in headaches on the propranolol and improvement in his vision on the acetazolamide[3], he continued to report symptoms of blurriness, vertigo, and a "foggy" feeling.  These reports were essentially unchanged during the July 2011 to June 2014 period reflected in the Administrative Record.   And, while a search for an accurate diagnosis continued, three specialists agreed on the most likely culprit:  persistent migrainous visual phenomena.  This was first offered by neuro-ophthalmologist Dr. Falardeau in January 2012.  Dr. Friedman noted several times that while Plaintiff's symptoms were atypical, "ocular migraine" remained a consideration.   And, Dr. Rosenbaum, the first IME neurologist, concluded in June 2013 that Plaintiff had a "recurrent migrainous aura."

Overall, Plaintiff's medical records show a consistency in symptom reporting, compliance with treatment, efforts to pinpoint a diagnosis, and a likely diagnosis of persistent migrainous visual phenomena.  The records also show consistent opinions that Plaintiff's symptoms

---

[3]  Immediately after starting this medication he reported to Dr. Godwin that his vision symptoms were 95% improved.  That improvement was not sustained, however, as soon thereafter, he consistently reported that although the medication helped, his episodes of blurriness continued and he saw only 20%-30% improvement on the medication.

prevented him from working because while Plaintiff retained the physical capacity to engage in several work-related functions, he experienced intermittent and incapacitating vision impairment.

Nonetheless, based on Dr. Rosenbaum's June 2013 IME report, Defendant concluded that Plaintiff was capable of light work. AR 197 (July 16, 2013 RN note stating that "IME physician indicates he is capable of light exertion with no bending at the wait [sic], constant sit, occasional walk but frequent stair climbing, which would still appear to be consistent with frequent walking"); AR 198 (Dec. 5, 2013 RN note stating that "light exertion with no bending at the waist is supported"). Given that Plaintiff's job at the time his symptoms began was "medium" exertion work, the change in Defendant's conclusion that Plaintiff could perform light work instead of sedentary work was inconsequential during the "Regular Occupation" period.

However, while there was slight improvement in the vision blurriness and some decrease in headaches, nothing about the effect of Plaintiff's intermittent symptoms changed in a significant way. He still was incapacitated during an "episode" with obscured vision, "foggy" or "druggy" feeling, loss of focus, nausea, and sometimes headache. Importantly, Dr. Rosenbaum's assessment of Plaintiff's exertion level and ability to engage in various activities was moderated by his note that Plaintiff needed frequent work breaks including hours of time off because of his symptoms, his prognosis was guarded, and his return-to-work date (which impliedly acknowledged that he could not work at that time), was unknown.

Even though Defendant changed its conclusion regarding Plaintiff's exertion level, there was still a complete lack of objective evidence upon which to base any limitations. As with the sedentary exertion level determination, the only basis in the record for any limitations of any level is Plaintiff's subjective symptom reports. Given that evidence, there is no rational basis in

31 - OPINION & ORDER

the record for the change in Defendant's determination that Plaintiff was limited to sedentary work at one point and then was limited to light work.

Once Defendant committed to implicitly crediting Plaintiff's subjective symptoms, its initial determination that Plaintiff could perform sedentary work was not a reasonable inference drawn from the medical evidence. Plaintiff experienced intermittent, debilitating vision blurriness which precluded work activity. From the outset, his primary care practitioners found that his symptoms rendered him unable to work and their opinions remained consistent. Similarly, with the implicit crediting of Plaintiff's subjective symptoms in support of the ability to perform light work, that determination was also not a reasonable inference drawn from the medical evidence. Rather, the medical evidence allows for alternative, but mutually exclusive, conclusions: (1) there are no functional limitations based on objective evidence; or (2) when accounting for subjective evidence, Plaintiff's symptoms prevented him from working in "Any Occupation" as defined by the policy. Defendant implicitly credited Plaintiff's subjective symptoms but it did so only partially and without explanation. Thus, neither its initial determination of sedentary work nor its subsequent determination of light work were supported in the record.

B. Objective Findings

Defendant's determination that Plaintiff can perform light work and thus is not Totally Disabled under the policy after January 16, 2014, can be supported only if it was reasonable to reject the limitations acknowledged by Plaintiff's treating practitioners, both IME neurologists, and the scores of other specialists who have examined him. The medical record is clear that objective testing has failed to establish a specific diagnosis for Plaintiff's symptoms. But, the

medical record is also clear that Plaintiff's report of symptoms has been consistent since their inception (other than a decrease in headaches on propranolol and some improvement of vision blurring on acetazolamide).

In the opinions of Dr. Peters and Dr. Friedman, Plaintiff's subjective symptoms are disabling. Dr. Rosenbaum indicated that Plaintiff's subjective symptoms are incompatible with full-time, consistent work. Dr. Bell's Physical Capability form was completed, as she states she was instructed, based on objective evidence only.

Because the record shows that based on objective medical evidence only, Plaintiff has virtually no limitations but based on his subjective complaints he is precluded from working, the question is whether Defendant appropriately disregarded Plaintiff's disabling symptoms when there is no objective medical evidence establishing them. Given the policy language and controlling case law, Defendant's rejection of Plaintiff's subjective complaints was not reasonable.

First, as stated above, the policy requires that Plaintiff be "Totally Disabled" as a result of an "Injury" or "Sickness." AR 11. This is not an injury case. "Sickness" means "illness or disease causing Total Disability." Id. "Total Disability" means that Plaintiff "cannot perform the material duties of Any Occupation." Id. The policy does not require that "sickness" be established only by objective medical evidence. And, the policy does not require that the inability to "perform the material duties of Any Occupation" be established only by objective medical evidence. Compare Cooper v. Intel Corp. Long Term Disability Plan, No. 3:13-cv-01852-HZ, 2014 WL 3895989, at *1 (D. Or. Aug. 8, 2014) (policy defined "disability" as "any illness or injury that is substantiated by Objective Medical Findings and which render a

33 - OPINION & ORDER

Participant incapable of performing work"); see also Maronde v. Sumco USA Grp. Long-Term

Disability Plan, 322 F. Supp. 2d 1132, 1139 (D. Or. 2004) ("Unless a plan contains specific

requirements for objective medical evidence, a plan administrator cannot deny a claim for

[chronic fatigue syndrome] simply because the plaintiff presents no such evidence.").

Second, in Salomaa, a case where the claimant had chronic fatigue syndrome, a

"condition for which there are no objective tests," the Ninth Circuit held that "conditioning an

award on the existence of evidence that cannot exist is arbitrary and capricious."  642 F.3d at

676, 678.  The court explained:

> One can understand the frustration of disability plan administrators with
> claims based on such diseases as chronic fatigue syndrome and fibromyalgia.
> Absence of objective proof through x-rays or blood tests of the existence or
> nonexistence of the disease creates a risk of false claims.  Claimants have an
> incentive to claim symptoms of a disease they do not have in order to obtain
> undeserved disability benefits.  But the claimants are not the only ones with an
> incentive to cheat.  The plan with a conflict of interests also has a financial
> incentive to cheat.  Failing to pay out money owed based on a false statement of
> reasons for denying is cheating, every bit as much as making a false claim.  The
> plan has no exception to coverage for chronic fatigue syndrome, so [the insurer]
> has taken on the risk of false claims for this difficult to diagnose condition. Many
> medical conditions depend for their diagnosis on patient reports of pain or other
> symptoms, and some cannot be objectively established until autopsy.  In neither
> case can a disability insurer condition converge on proof by objective indicators
> such as blood tests where the condition is recognized yet no such proof is
> possible.

Id. at 678.  In a similar case involving subjective complaints of chronic pain, the Northern

District of California found that the insurer "abused its discretion by failing to consider

subjective evidence in [Plaintiff's] favor."  James v. AT&T Disability Benefits Prog., 41 F. Supp.

3d 849, 879 (N.D. Cal. 2014) (relying on Salomaa, 642 F.3d at 678).  The court noted that the

defendant's reliance on the absence of objective evidence to deny the plaintiff's disability benefits

was an implicit rejection of the plaintiff's subjective complaints of pain.  Id.  The court then

remarked that "pain is an inherently subjective condition" and further, "it is unclear what

objective evidence the plan wished to see to prove that [the plaintiff's] pain prevented her from

working."  Id. at 880.

In another similar case, the Northern District of California again cited Salomaa for the

proposition that "in cases where the claimant's disabling condition is not one for which the

medical community can provide objective evidence," it is arbitrary and capricious to deny the

claim for lack of such evidence.  Hegarty v. AT&T Umbrella Benefit Plan No. 1, 109 F. Supp. 3d

1250, 1256 (N.D. Cal. 2015).  In Hegarty, the plaintiff suffered from migraine headaches.

Because "present-day laboratory tests cannot prove the existence of migraine headaches, . . .

symptoms reported by the patient are often the only means available to prove their existence."

Id. (internal quotation marks and brackets omitted).  Given the nature of the plaintiff's condition,

the court found that the defendant abused its discretion in denying the plaintiff's appeal from the

denial of her disability benefits because its action was arbitrary and capricious and thus,

unreasonable.  Id.

The same holds true here.  Defendant interpreted the reports and Physical Capabilities

forms completed by Dr. Peters and Dr. Rosenbaum to support a finding that Plaintiff could

perform light or sedentary work.  But, in doing so, Defendant disregarded that those reports and

forms indicated that Plaintiff's subjective symptoms severely limited his work-related abilities to

a few repetitions or necessitated frequent breaks.  With this, defendant implicitly rejected

Plaintiff's subjective reports of disabling symptoms.

Defendant argues Salomaa is distinguishable because the disability at issue there was

chronic fatigue syndrome, a diagnosis for which there is no confirming test. Defendant argues

that for many of Plaintiff's conditions, "there are tests but they failed to corroborate his

symptoms." Def.'s Resp. at 8. But the only test Defendant mentions is unspecified

"neuropsychological testing" for "[c]ognitive problems." Id. Defendant mentions no possible

test for the intermittent vision blurring, vertigo, or nausea. Next, Defendant notes that the tests

Plaintiff underwent could not explain Plaintiff's atypical or unusual symptoms. But, atypical

symptoms are not a basis to deny their existence. And certainly, many diseases are diagnosed by

a process of elimination, not by positive-results testing. The medical record indicates that

"persistent migrainous visual phenomena" was the most probable diagnosis, even though the

symptoms were not typical.

Defendant also argues that unlike in Salomaa where the insurer demanded objective proof

supporting a diagnosis, Defendant demanded only that Plaintiff provide objective proof of his

physical limitations. Id. Defendant cites cases which are largely distinguishable. For example,

in one case the court applied a less stringent standard of review. Takata v. Hartford

Comprehensive Emp. Benefit Serv. Co., No. CV-11-5068-RMP, 2012 WL 4903587, at *6, *10

n.4, *11 n.6 (E.D. Wash. Oct. 16, 2012) (court reviewed for abuse of discretion but without the

"heightened" standard required when there is a structural conflict of interest which was absent),

aff'd, 572 F. App'x 497 (9th Cir. May 8, 2014). Additionally, the record in that case contained

video surveillance evidence undermining the plaintiff's claimed subjective limitations. In finding

that the defendant did not abuse its discretion by relying on a lack of objective evidence

supporting the plaintiff's claim, the Takata court expressed concern that to "find otherwise would

imply that a claims administrator must always accept as completely accurate a diagnosis of

fibromyalgia and/or chronic fatigue syndrome *and* the claimant's subjective report of the limitations and restrictions[.]" Id. at *11.  The concern is overstated, however, because cases will always be evaluated based on their individual records.

In another case Defendant cites, the court found that the plaintiff's self-reported symptoms were contradicted by testing showing Plaintiff to be within normal limits across all cognitive domains.  Langlois v. Metro. Life Ins. Co., No. 11-cv-03472-RMW, 2012 WL 1910020, at *14 (N.D. Cal. May 24, 2012).  The court recognized both that "subjective evidence" is "inherently less reliable than objective evidence[,]" and that certain "disorders may not always be objectively verifiable." Id.  Given the results of the objective testing, however, the court found that evidence to be more convincing. Id.  In contrast, here, while the objective testing has ruled out a variety of potential causes for Plaintiff's cluster of symptoms, none has contradicted the presence of those symptoms.

Furthermore, there is no objective way to measure most of Plaintiff's symptoms, including the particular symptom of episodic vision impairment.  It can be evaluated based only on Plaintiff's reports.  The Hegarty court rejected a similar argument made by the insurer in a migraine-based disability claim:

> To be sure, the Sedgewick doctors appear to have also concluded that there was no objective proof of restrictions and limitations on Plaintiff's ability to work. In some situations, such as where there is a restricted range of movement of a limb or inability to lift, requiring proof of such limitation would not be arbitrary. But here, where the limitations or restrictions are based on migraine pain, such limitations, because they are consequential to the pain, those restrictions are likely to defy objective clinical proof.

Hegarty, 109 F. Supp. 3d at 1257.

Here, there are (1) two treating practitioners who have accepted Plaintiff's subjective

symptom reports; (2) one IME physician (Dr. Rosenbaum) who did not dispute those subjective symptoms and agreed with the specialist neuro-ophthalmologist on the probable diagnosis of persistent migrainous visual phenomena; (3) no treating or examining practitioner (other than Dr. Bell, discussed below), who has suggested or implied that Plaintiff's report of symptoms was not reliable or credible; and (4) the presence of symptoms not amenable to objective assessment. Based on these facts, it was arbitrary and unreasonable to disregard Plaintiff's subjectively-reported limitations.

C.  Dr. Bell's Report

Defendant's initial termination of Plaintiff's LTD benefits occurred before Dr. Bell's April 2014 IME.  But, Defendant cites Dr. Bell's report in its June 11 and 13, 2014 letters upholding its prior termination decision.  There, Defendant notes Dr. Bell's "primary diagnosis" of "rule out possible somatoform disorder."  AR 309-10, 320-21.  Defendant quotes a paragraph of her explanation for that opinion.  Id.  Then, Defendant notes Dr. Bell's assessment of Plaintiff's ability to work full-time, including his ability to continuously engage in several gross motor activities such as standing, sitting, bending, as well as driving, and to lift at a medium level of exertion.  AR 309, 321.  Based on Dr. Bell's assessment, Defendant had a vocational specialist determine if Plaintiff could engage in light work.  AR 309-10, 321.  Defendant explains that in "considering the totality of data concerning your medical condition in conjunction with the independent opinions by Dr. Rosenbaum and Dr. Bell," it concluded he could perform the material duties of the three gas-meter positions.  AR 310, 321.  It further explains that it maintained its "position that the severity" of Plaintiff's "ailments" did not preclude light work function and that its position was "further confirmed through the independent opinions of Dr.

Rosenbaum and Dr. Bell." Id.

Defendant abused its discretion by relying on Dr. Bell's diagnosis and assessment. First, Dr. Bell's functional assessment was, as she indicated, based on objective evidence only. In fact, Dr. Bell stated that she had been instructed to complete the Physical Capabilities form on that basis. For the reasons explained in the previous section, it was unreasonable to disregard a functional assessment that did not account for Plaintiff's subjective symptoms.

Second, while it is unclear how much weight Defendant gave Dr. Bell's actual "rule out" somatoform disorder "diagnosis," Defendant erred by considering it at all. Notably, Dr. Bell's "diagnosis" is not a diagnosis at all, but a "rule out," meaning a suggested diagnosis that must be "ruled out"; it is not a definitive diagnosis. See F.A. Davis, Taber's Cyclopedic Medical Dictionary 2057 (21st ed. 2009) (defining "rule out":  "In medicine, to eliminate one diagnostic possibility from the list of causes of a patient's presenting signs and symptoms."); see also http://www.medicinenet.com/script/main/art.asp?articlekey=33831 (defining "rule out":  "Term used in medicine, meaning to eliminate or exclude something from consideration."). Thus, because this was not a definitive diagnosis, it was unreasonable for Defendant to consider it.

Second, it is clear that Dr. Bell's opinion is an outlier. None of the other medical practitioners who treated or examined Plaintiff, including Defendant's other IME neurologist, suggested any possible mental condition basis of Plaintiff's symptoms. There are no chart notes implying malingering, exaggeration of symptoms, or other associated "pain" or "symptom" "behavior." Additionally, Dr. Bell herself stated that appropriate testing to confirm the possibility of a somatoform disorder should be conducted by a psychiatric IME using a particular personality inventory profile exam. Defendant, however, never pursued this additional

examination.

Furthermore, in indicating that Plaintiff might suffer from somatoform disorder, Dr. Bell mistakenly noted that his symptoms had failed to respond to treatment when Plaintiff actually reported a decrease of headaches on the propranolol and an improvement in vision on the acetazolamide.  And she failed to account for Dr. Falardeau's pessimism regarding successful treatments for the visual disturbance condition.  She also noted that Plaintiff had a history of "vague subjective complaints" which had led to "disability on a relatively frequent basis in the past." AR 847 (emphasis added).  This finding is not supported by the record.  While there is a history of migraines, sinusitis, and upper respiratory infection symptoms (which Plaintiff attributed to his constant exposure to germs by frequently entering into customers' homes to work on their gas devices), there is no report of these complaints leading to disability any at other time. AR 823-24.

Finally, while Dr. Bell opined that Plaintiff had the "hallmark features of a somatoform disorder," she did not indicate that he had "excessive thoughts, feelings, or behaviors" regarding his symptoms which is one of the primary characterizations of what is now known as "somatic symptom disorder."  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 311 (5th ed. 2013) (DSM-5).  The DSM-5 introduces the chapter on "Somatic Symptom and Related Disorders" by explaining that the "major diagnosis in this diagnostic class, somatic symptom disorder, emphasizes diagnosis made on the basis of positive symptoms and signs (distressing somatic symptoms plus abnormal thoughts, feelings and behaviors in response to these symptoms), rather than the absence of a medical explanation for somatic symptoms." DSM-5 309 (emphasis added).  And, in explaining the change in diagnostic criteria from the

previous edition of the treatise, the DSM-5 explains that the "previous criteria overemphasized the centrality of medically unexplained symptoms." Id.  The DSM-5 makes clear that "[i]t is not appropriate to give an individual a mental disorder diagnosis solely because a medial cause cannot be demonstrated." Id.  The classification in the 2013 Fifth Edition "defines . . .somatic symptom disorder[] on the basis of positive symptoms (distressing somatic symptoms plus abnormal thoughts, feelings, and behaviors in response to these symptoms)." Id. at 309-10.

In support of her suggested "rule out" somatoform disorder "diagnosis," Dr. Bell recited Plaintiff's unusual constellation of symptoms which had stumped specialists, his normal objective testing, symptoms which did not respond to treatment and which gradually worsened over time (which is not a fair reading of the record (as explained above), and his lengthy history of "vague subjective complaints" resulting in frequent past disability (another finding not supported by the record as noted above). AR 846, 847.  It is possible that Plaintiff exhibits some features of the disorder.  But, Dr. Bell's opinion that he exhibits the "hallmark" features is inconsistent with the DSM-5 absent a finding that his response to his symptoms was abnormal or excessive.

Because Dr. Bell's report indicated that the somatoform disorder was a "rule out" "diagnosis," because her assessment failed to account for Plaintiff's subjective limitations, was based on factual findings not supported by the record, was not confirmed by a psychiatric specialist, and lacked a key feature of the current diagnostic criteria, any reliance on her report by Defendant was arbitrary and unreasonable.

D.  Other Factors Suggesting Abuse of Discretion

Plaintiff points to several favors he argues further establish that Defendant's structural

conflict of interest caused an unreasonable, biased review tainting the entire decisionmaking

process.  Pl.'s Mtn at 7.  This Opinion has already addressed most of those factors.  Not

previously discussed is Plaintiff's argument that Defendant ignored the SSA determination that

Plaintiff was disabled from all gainful employment and that Defendant violated an ERISA

regulation by failing to inform Plaintiff what information was required to satisfy Defendant.

"The failure to provide a full explanation for the difference between the SSA's finding of

disability and an ERISA plan administrator's finding of non-disability is not a reversible error *per

se*."  Robertson, 2015 WL 5766923, at *11.  But, "[e]vidence of a Social Security award of

disability benefits is of sufficient significance that failure to address it offers support that the plan

administrator's denial was arbitrary, an abuse of discretion."  Salomaa, 642 F.3d at 679 (internal

citations and footnotes omitted).

The initial termination-of-benefits letter from December 2013 contained boilerplate

language acknowledging the favorable social security determination but without an

individualized assessment of the decision.  Defendant simply stated that the entitlement to social

security "may" be based on different guidelines and that each benefit provider "may" consider

different medical evidence.  AR 293.  This is insufficient to satisfy Defendant's obligation to

thoroughly assess Plaintiff's claim.  Topits v. Life Ins. Co. of N. Am., No. 3:12-cv-00661-ST,

2013 WL 5524129, at *2 n.2 (D. Or. Apr. 11, 2013) ("While [the insurer] did not completely

ignore the SSA disability award, its offhand observation that the standards 'may' differ for the

two types of awards is scant evidence that it considered the SSA award[.]"), adopted by Judge

Simon, 2013 WL 5524131 (D. Or. Sept. 30, 2013)

Defendant did, however, more fully address the SSA award in its June 13, 2014 letter

affirming its earlier termination.   While retaining the same boilerplate language regarding the different set of guidelines or different medical evidence it relied on in the December 2013 letter, Defendant now included one sentence stating that "[f]or example," the SSA did not have Dr. Rosenbaum's or Dr. Bell's IME results or "other medical and vocational information [Defendant] may have developed in your file."  AR 322.  Defendant explained that had the SSA reviewed that information along with the other medical information Defendant had obtained, it might have reached a different conclusion.  Id.

This is certainly a better attempt by Defendant to explain the different outcomes.  It barely suffices, however, because it still does not explain in a meaningful way why Defendant concluded that the two IME reports, the only evidence Defendant mentions with specificity, produce a contrary determination.  Without the June 13, 2014 letter, I would easily conclude that Defendant's decision is to be viewed with increased skepticism due to its failure to meaningfully evaluate the SSA award in the December 2013 letter.  The June 2014 letter somewhat ameliorates the effect of Defendant's previous error and thus, I give some, but not significant, weight to this in my analysis.

Finally, Plaintiff contends that Defendant violated 29 C.F.R. § 2650.503-1(g)(l)(iii) which requires Defendant to provide in its benefits-determination communication "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]"

In its December 16, 2013 termination letter, Defendant told Plaintiff that he could request a review of the determination and that his

request should state any reasons why you feel this determination is incorrect, and

should include any written comments, documents, records, or other information
relating to your claim for benefits, including but not limited to any information
submitted in conjunction with any claim for Social Security disability or other
benefits which you would like us to consider.

AR 293.

Plaintiff argues that this is boilerplate language, lacking identification of any specific

information or explanation of the necessity of such information.  Defendant argues in response

that because the denial letter told Plaintiff that he was "capable of light work activity with

restrictions and limitations of no bending at the waist[,]" AR 293, "Plaintiff knew the basis for

[Defendant's] decision and what was needed."  Def.'s Resp. at 11 (emphasis added).  Apparently,

according to Defendant, telling Plaintiff that he could perform light work was enough to tell

Plaintiff that he "had to provide proof that he was incapable of light duty work."  Id.  Defendant

insists that "[t]his is not a case where Plaintiff could not know from the denial letter the basis for

the claim denial."  Id.

I disagree with Defendant.  The December 16, 2013 letter provided no specific reference

to any conclusions or assessments provided by Dr. Friedman or Dr. Peters, both of whom opined

that Plaintiff could not work.  Defendant only generally referred to "all of the information in your

claim file, including (but not limited to) the information provided by Dr. Friedman and Peters,"

and stated that "[b]ased on this information" Defendant concluded Plaintiff could perform light

work.  AR 293.  This fails to give Plaintiff any specific information about Defendant's analysis

including that Defendant was now effectively rejecting Plaintiff's subjective symptoms when it

had implicitly credited them earlier.  Further, the finding was confusing because Dr. Peters had

previously indicated that Plaintiff could perform a heavy level of exertion (with the further

44 - OPINION & ORDER

explanation that such exertion could not be sustained beyond one or two repetitions). And Dr. Rosenbaum had said both that Plaintiff could perform medium work and light work but only with frequent breaks or hours off. How Defendant interpreted the evidence as indicating the ability to perform light work is completely absent from the letter. As a result, Defendant's argument that telling Plaintiff that he could perform light work was sufficient for Plaintiff to figure out for himself what was needed to establish his claim, lacks merit. Accordingly, a heightened degree of scrutiny of Defendant's determination is warranted.

CONCLUSION

Plaintiff's motion for summary judgment [13] is granted. Defendant's motion for summary judgment [15] is denied. Plaintiff shall prepare an appropriate Judgment consistent with this Opinion and, after conferring with Defendant, shall submit it to the Court for signature within 14 days of the date below.

IT IS SO ORDERED.

Dated this _____ day of _____, 2016

Marco A. Hernandez
United States District Judge

45 - OPINION & ORDER